UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                              Case No. 06-10886-DHW
                                                   Chapter 13
S. T. TUCK,

    Debtor.

MEMORANDUM OPINION

S. T. Tuck, the debtor in this chapter 13 case, filed an objection to the $16,167.18 deficiency claim of National Auto Finance Company ("National") arising from the surrender of the debtor's vehicle. At issue is whether National held a purchase-money security interest in the vehicle as a result of the inclusion in the amount financed of negative equity from a traded-in vehicle.

For the following reasons the court holds that National lost its purchase-money interest under the dual status rule. Therefore, the hanging paragraph of § 1325(a) does not apply, and the creditor retains its right to a deficiency claim.

Jurisdiction

The court's jurisdiction derives from 28 U.S.C. § 1334 and from the general order of the United States District Court for this district referring title 11 matters to the Bankruptcy Court. Further, because the issue concerns the allowance or disallowance of a claim against the estate, this is a core proceeding under 28 U.S.C. § 157(b)(2)(B) in which the court's jurisdiction extends to the entry of a final order or judgment.

Undisputed Facts

On December 9, 2004, Tuck purchased a 2004 Nissan Maxima. The

-1-

Case 06-10886    Doc 57    Filed 12/10/07    Entered 12/10/07 16:40:18    Desc Main
                  Document      Page 1 of 7

purchase was financed by National. Exhibit C-2, Retail Installment Contract, evidences that transaction.

In connection with the purchase, Tuck traded-in a 1998 Mazda that was subject to the lien of Ford Motor Credit. He was allowed a $3,500 value for the trade-in, but the debt owing to Ford Motor Credit on that vehicle was $5,908.04. Therefore, the Mazda had a negative equity of $2,408.04 (the difference between the vehicle's value and the payoff). This negative equity was included in the total amount financed by National ($35,543.96).

The monthly payments under the contract were $716.37. There was no contractual provision allocating any part of the monthly payment to the negative equity portion of the amount financed.

Tuck's chapter 13 plan, which was confirmed on January 11, 2007, provided for the surrender of the Nissan Maxima in full satisfaction of National's claim. National filed an unsecured claim in the amount of $16,167.18 representing the deficiency balance following the sale of the vehicle.

Conclusions of Law

This court has held that claims qualifying under the so-called hanging paragraph of 11 U.S.C. § 1325(a) may not be bifurcated into secured and unsecured components but must be treated as fully secured. *See In re Wright*, 338 B.R. 917 (Bankr. M.D. Ala. 2006); *In re Horn*, 338 B.R. 110 (Bankr. M.D. Ala. 2006). Further, this court has held that a chapter 13 debtor may elect to surrender collateral in full satisfaction of a secured creditor's claim (precluding a deficiency claim) provided that the claim qualifies under the hanging paragraph. *In re Barrett*, 2007 WL 2081702 (Bankr. M.D. Ala. 2007) (direct appeal to the 11th Cir. pending). In order for a claim to qualify under the hanging paragraph, the secured creditor

Case 06-10886    Doc 57    Filed 12/10/07    Entered 12/10/07 16:40:18    Desc Main
Document      Page 2 of 7

must, *inter alia*, hold a purchase-money security interest in the collateral.[1]

The debtor contends that National held a purchase-money security interest in the 2004 Nissan and that because the hanging paragraph is applicable, the Nissan may be surrendered in full satisfaction of the debt. National, on the other hand, asserts that it lost its purchase-money security interest by including the negative equity from the 1998 Mazda in the amount financed. National contends that because the hanging paragraph is not applicable, it retains the right to a deficiency claim. The court agrees that National retains the right to a deficiency claim but for a different reason.

The court must look to state law to determine whether a security interest is a purchase-money security interest. *See In re Vega*, 344 B.R. 616, 622 (Bankr. D. Kan. 2006). Though federal law determines what property constitutes property of the bankruptcy estate, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Alabama law provides:

> (b) *Purchase-money security interest in goods.* A security interest in goods is a purchase-money security interest:
> (1) *to the extent that* the goods are purchase-money collateral with respect to that security interest;

*Ala. Code* § 7-9A-103(b) (emphasis added).

The above statutory definition relies, in turn, upon the definitions of

---

[1] The hanging paragraph of 11 U.S.C. §1325(a) provides in relevant part:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a *purchase money security interest* securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . (emphasis added).

the terms purchase-money collateral and purchase-money obligation. Purchase-money collateral means goods that secure a purchase-money obligation. *See Ala. Code* 7-9A-103(a)(1). Purchase-money obligation means an obligation "incurred as *all or part of the price of the collateral* or for value given to enable the debtor to acquire rights in . . . the collateral if the value is in fact so used." *Ala. Code* 7-9A-103(a)(2) (emphasis added).

The courts are split on the issue of whether negative equity from a trade-in vehicle constitutes a part of the purchase price of the current vehicle.[2] This court agrees with the reasoning expressed in the following cases concluding that negative equity is not a part of the price of the collateral: *In re Peaslee*, 358 B.R. 545 (Bankr. W.D.N.Y. 2006), *rev'd,* 373 B.R. 252 (W.D.N.Y. 2007); *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007); *In re Westfall*, 365 B.R. 755 (Bankr. N.D. Ohio 2007); *In re Bray*, 365 B.R. 850 (Bankr. W.D. Tenn. 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal. 2007); *In re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla. 2007); and *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007). The price of the collateral is "the actual price of the collateral being acquired." *Peaslee*, 358 B.R. at 556. It follows that the negative equity portion of the amount financed is not a purchase-money obligation.

This conclusion is supported by Official Comment 3 to *Ala. Code* § 7-9A-103 which states as follows:

> . . . [T]he definition of "purchase-money obligation," the

---

[2] The following cases have held that negative equity is part of the price of the vehicle: *Graupner v. Nuvell Credit Corp.*, 2007 WL 1858291 (M.D. Ga. June 26, 2007); *GMAC v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007) (reversing the bankruptcy court's decision); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D.N.Y. 2007); *In re Cohrs*, 2007 WL 2050980 (Bankr. E.D. Cal. June 25, 2007); *In re Wall*, 2007 WL 2967235 (Bankr. W.D.N.C. Sept. 17, 2007). These cases were decided by courts in Georgia, New York, California, and North Carolina. The courts in Georgia, New York, and California reached the decision, in part, by reading UCC provisions *in pari materia* with other state law. This court is not aware of any comparable law in Alabama defining price to include negative equity.

"price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

Comment 3 reflects that expenses directly related and incidental to the price may be considered part of the "price" of the collateral. The list is not exhaustive and extends to "other similar obligations." Negative equity from a trade-in is not an expense directly related to the purchase of the second vehicle nor incidental to that purchase. It is not an obligation "similar" to those on the list. Neither does it bear a "close nexus" between the acquisition of the collateral and secured obligation. The negative equity represents a prior obligation in connection with a prior vehicle. It is not an expense "incurred in connection with acquiring rights in the [current] collateral." *Id.*

Therefore, the instant transaction comprises both purchase-money and non-purchase-money obligations. The question arises: does a purchase-money security interest retain its character when combined in one transaction with a non-purchase-money security interest?

Two approaches have evolved in consumer transactions. "The 'transformation rule' holds that a security interest that is part purchase-money and part non-purchase-money completely loses its purchase-money character and is entirely transformed into a non-purchase-money security interest." *In re Pajot*, 371 B.R. at 157 (citation omitted).

Case 06-10886    Doc 57    Filed 12/10/07    Entered 12/10/07 16:40:18    Desc Main
Document      Page 5 of 7

The other approach, known as the "dual status rule," "allows the court to treat the portion that is purchase-money (essentially the purchase price) as purchase-money, whereas the non-purchase-money portion remains non-purchase-money and is treated accordingly." *Id.* at 157 (citations omitted). Under the dual status rule, however, the purchase-money portion is lost if there is no contractual provision allocating payment between the purchase-money and non-purchase-money portions of the obligation. An allocation provision is necessary in order to determine when the purchase-money portion is paid resulting in the release of the collateral from the lien.

Although Alabama's version of the UCC dictates use of the dual status rule in commercial transactions, it allows the court to "continue to apply established approaches" in consumer-goods transactions. *Ala. Code* § 7-9A-103(h). This jurisdiction employs the dual status rule in consumer transactions as reflected by the following cases.

In *Roberts Furniture Co. v. Pierce (In re Manuel),* 507 F.2d 990 (5th Cir. 1975), a case of binding precedent in this Circuit, the debtor purchased furniture from a furniture dealer who took a purchase-money security interest in the goods for the unpaid purchase price. Later, the debtor purchased a television set from the same dealer, and the unpaid balance from the original transaction was included in the second contract. The contract, however, failed to make any provision for allocation of payments between the portion secured by the furniture and the portion secured by the television set. The furniture therefore secured more than its price. The court held that the dealer lost its purchase-money security interest in the furniture. *Id.* at 993.

Similarly, in *Southtrust Bank v. Borg-Warner Acceptance Corp.*, 760 F.2d 1240 (11th Cir. 1985) the court concluded that "[u]nless a lender contractually provides some method for determining the extent to which each item of collateral secures its purchase money, it effectively gives up its purchase money status." *Id.* at 1243. Look also at the holding of the District Court for this district in *Skinner's Furniture Store v. McCall (In re*

*McCall)*, 62 B.R. 57 (M.D. Ala. 1985). The court adopted the dual status rule, holding that the purchase-money status of the lender was preserved because the contract contained an adequate allocation method – a first-in, first-out schedule. *Id.* at 59-60. Finally, in *Snap-On Tools, Inc. v. Freeman (In re Freeman)*, 956 F.2d 252 (11th Cir. 1992) the court concluded that "[u]nless the lender contractually provides some method for determining the extent to which each item of collateral secures its purchase money, it effectively gives up its purchase money status." *Id.* at 255.

In the case at bar, the court has concluded that the portion of the secured debt resulting from the roll-over of negative equity does not enjoy purchase-money status. However, under the dual status approach, the purchase-money character of the balance of the debt is not destroyed as long as the contract provides a method for allocation of payments between the portion representing the purchase price and the portion representing the negative equity. This the contract failed to do, and as a result, National lost its purchase-money status.

Conclusion

Because National did not have a purchase-money security interest in the debtor's vehicle, National's claim does not qualify under the hanging paragraph of § 1325(a). Therefore, the claim may be bifurcated into secured and unsecured components, and National retains its right to a deficiency claim on disposition of the collateral. Accordingly, by separate order, the debtor's objection to National's claim will be overruled.

Done this the 10th day of December, 2007.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Debtor
　Michael D. Brock, Debtor's Attorney
　Paul J. Spina, III, National's Attorney
　Curtis C. Reding, Trustee